UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| SPINNER CONSULTING LLC, | Civil No. 3:19cv1341 (JBA) |
| *Plaintiff*, | |
| *v.* | September 30, 2020 |
| STONE POINT CAPITAL LLC., | |
| *Defendant*. | |

**RULING GRANTING DEFENDANT'S MOTION TO DISMISS**

Plaintiff Spinner Consulting LLC ("Spinner") brings several claims against Defendant Stone Point Capital LLC ("Stone Point") on behalf of itself and those similarly situated for violations of federal, California, and Connecticut antitrust law for price fixing in pricing its bankruptcy support services. Defendant moves to dismiss the Complaint for lack of subject matter jurisdiction and failure to state a claim upon which relief can be granted. For the reasons that follow, Defendant's Motion to Dismiss [Doc. # 34] is granted.

**I.        Facts Alleged in Complaint**

Plaintiff alleges that Stone Point, an affiliate of Bankruptcy Management Solutions, Inc. ("BMS"), engaged in a conspiracy with its two largest competitors to "fix the manner of charging Chapter 7 bankruptcy estates . . . for bankruptcy support services. (Compl. [Doc. # 1] ¶ 1.) BMS is the largest provider of bankruptcy support services, including bankruptcy

software, in the United States, with about 50 percent market share for bankruptcy support services. (*Id.* ¶¶ 6, 22.)  Its two largest competitors are Epiq eDiscovery Solutions, Inc. ("Epiq") and TrusteSolutions, which have a 35 percent and a 15 percent market share, respectively. (*Id.* ¶¶ 6-7, 22.) BMS and its competitors all develop and provide software to assist bankruptcy trustees in meeting their reporting requirements and other obligations. (*Id.* ¶¶ 17, 19.)

Prior to 2008, instead of charging fees directly to estates, BMS would direct estates to deposit funds into a selected bank. (*Id.* ¶ 27.) The bank would earn interest on these deposits and then pay a fee to BMS and interest to the estate. (*Id.*) When interest rates declined during the Financial Crisis of 2008, BMS sought to develop a new payment structure in order to maintain or increase profits. (*Id.* ¶¶ 28-30.) As a result, "BMS decided to sell bankruptcy support services only in combination with bankruptcy banking services ("Combined Services") and charging estates no fee for those Combined Services other than a percentage of the money in the bank account of the estate." (*Id.* ¶ 31.) Plaintiff alleges that this fee structure made it more difficult for trustees to determine whether fees for bankruptcy support services were "modest, reasonable, or excessive." (*Id.* ¶ 32.)

In order to get the marketplace to accept this new pricing structure, Plaintiff alleges that BMS proposed that the other two market participants—Epiq and TrusteSolutions— agree to the same pricing structure. (*Id.* ¶ 33.) They then lobbied the U.S. Trustee to suspend the rule giving the United States Bankruptcy Court authority to approve actual and necessary administrative expenses and allow bankruptcy trustees to pay bank service fees from estate accounts. (*Id.* ¶¶ 36-37.) BMS reflected this in a letter it sent to the Executive Offices of the U.S. Trustee writing:

> In several conversations with various participant banks, a number of options have been discussed. Satisfying all of the conditions presented above, however, left a single structural option. . . . First, since estates do not currently pay for services (banking and software) through a reduction in their interest income, have them continue to

pay for these services via a service fee, as a % of average deposit balance assessed monthly on each account.

(*Id.* ¶ 38.) BMS later referred to this new pricing structure as "a structural solution." (*Id.*) Epiq submitted a similar request to the U.S. Trustee on January 18, 2011, and TrusteSolution on January 21, 2011. (*Id.* ¶¶ 40-41.) On April 29, 2011, the U.S. Trustee suspended its rule prohibiting trustees from paying bank service fees from estate accounts. (*Id.* ¶ 42.)

Plaintiff alleges that shortly after the U.S. Trustee suspended its rule, all three companies began selling bankruptcy support services only in combination with bankruptcy banking services and charging one combined percentage fee based on the amount in the bank account of the estate rather than separate fees for bankruptcy support services and bankruptcy banking services. (*Id.* ¶ 43-44.) BMS and Rabobank (BMS's banking partner) now charge an annual rate of 1.75 percent of the amount on deposit at Rabobank, Epiq also charges 1.75 percent, and TrusteSolutions now charges 1.9 percent. (*Id.* ¶ 49.)

On April 12, 2017, Stone Point caused Trident, a fund that it manages and owns, to acquire a controlling ownership interest in BMS. (*Id.* ¶ 67.) Plaintiff alleges that prior to acquiring BMS, Stone Point learned of the conspiracy to fix the manner of selling and charging for Combined Services. (*Id.* ¶ 69.) Plaintiff further alleges that Stone Point has engaged in acts in furtherance of the conspiracy, including approving BMS business plans "that required the continuation of the existing manner of selling and charging for Combined services," appointing co-CEOs who would effectuate the conspiracy, and causing a former employee of Epiq to be elected director of BMS in order to further the conspiracy. (*Id.* ¶ 75.)

On March 31, 2015, one Robert Fusari filed a petition under Chapter 7 of the Bankruptcy Code. (*Id.* ¶ 50.) The U.S. Trustee appointed an individual trustee, who was eventually replaced by Alan E. Gamza at the election of the creditors of the Fusari estate. (*Id.*) The Fusari Estate, through Mr. Gamza, entered into a contract with Rabobank. (*Id.* ¶ 53.) Pursuant to the contract, Rabobank automatically withdrew a monthly fee from the Fusari Estate account. (*Id.* ¶ 44.) In total, Rabobank deducted $15,627.98 from the Fusari Estate

account. (*Id.* ¶ 58.) Rabobank paid this entire amount to BMS pursuant to its contract with BMS. (*Id.* ¶ 59.) Plaintiff alleges that the Fusari Estate would have paid lower fees absent the conspiracy to fix the manner of charging estates for bankruptcy support services. (*Id.* ¶ 61.)

Fusari's bankruptcy case settled and was dismissed on May 26, 2016. (*Id.* ¶ 63.) By agreement as of July 27, 2018, Spinner acquired from Fusari the property that had vested in Fusari under the bankruptcy settlement's revesting provision. (*Id.* ¶ 66.) That property includes the claim asserted in this action. (*Id.*)

## II.   Discussion

### A.   Legal Standard

"[A] claim is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory authority or constitutional power to adjudicate it." *Morrison v. Nat'l Australia Bank, Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (quoting *Arar v. Ashcroft*, 532 F.3d 157, 168 (2d Cir. 2008)). "When considering a motion to dismiss pursuant to Rule 12(b)(1), the court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff." *Sweet v. Sheahan*, 235 F.3d 80, 83 (2d Cir. 2000). In response to a motion to dismiss pursuant to Rule 12(b)(1), "[a] plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Makarova v. United States*, 201 F.3d 110, 113 (2d. Cir. 2000).

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although detailed allegations are not required, a claim will be found facially plausible only if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Conclusory allegations are not sufficient. *Id.* at 678-679.

### B.   Defendant's Motion to Dismiss

4

Stone Point moves to dismiss the complaint under Fed. R. Civ. P. 12(b)(1) and Fed. R. Civ. P. 12(b)(6) for six reasons: (1) "Stone Point had no involvement in BMS until nearly one year after the events at issue," thereby destroying any proximate cause between Stone Point's conduct and Plaintiff's claims; (2) "[Plaintiff] is not a direct purchaser of Stone Point's (or BMS's) services, and thus lacks standing to bring its Sherman Act claim (and its Connecticut state law claim) under the *Illinois Brick* line of cases"; (3) "Plaintiff's Sherman Act and Connecticut antitrust claims against Stone Point are foreclosed by the doctrine of collateral estoppel"; (4) Defendant's efforts to lobby the Executive Office of the United States Trustee are privileged under *Noerr-Pennington* doctrine; (5) Plaintiff's claims are barred by waiver, *res judicata*, and release for failing to object to the trustee's payment of fees in the *Fusari* bankruptcy proceedings; and (6) Plaintiff fails to allege facts sufficient to satisfy the Supreme Court's test under *Twombly*. (Def.'s Mem. Supp. Mot. to Dismiss [Doc. # 34-1] at 8-9.) In its Supplemental Brief, Defendant also asserts that Plaintiff lacks standing to pursue its California antitrust claims under the relevant test set forth in *Associated General Contractors of California v. California State Council of Carpenters*. (Def.'s Suppl. Mem. [Doc. # 43] at 8 (citing 459 U.S. 519 (1983)).)

1.   Illinois Brick *Rule*

The *Illinois Brick* rule limits standing in Sherman Act claims for damages to direct purchasers of the product or service. *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 745-746 (1977); *Salveson v. JP Morgan Chase & Co.*, 663 F. App'x 71, 74 (2d Cir. 2016); *Simon v. KeySpan Corp.*, 694 F.3d 196, 201 (2d Cir. 2012). Therefore, "indirect purchasers who are two or more steps removed from the antitrust violator in a distribution chain may not sue." *Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1521 (2019). In assessing whether a plaintiff is a direct purchaser, courts examine the "economic substance of the transaction." *Howard Hess Dental Labs. Inc. v. Dentsply Intern., Inc.* 424 F.3d 363, 373 (3d Cir. 2005); *see also In re Vitamin C Antitrust Litigation*, 904 F. Supp. 2d 310, 322 n. 5 (E.D.N.Y. 2012) (noting that the plaintiff's case was

distinguishable from *Dentsply*). Where a plaintiff must operate through another actor in a distribution chain before the product reaches it, the plaintiff is not a direct purchaser. *See Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 88 (3d Cir. 2011).

Illinois Brick creates a bright-line rule without any "carve out exceptions." *Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199, 216 (1990) (internal quotation omitted). The *Illinois Brick* rule serves two purposes. First, it prevents defendants from being exposed to "multiple liability." *Illinois Brick*, 431 U.S. at 720. Since direct purchasers are permitted to recover the full amount of any overcharge, allowing the direct purchasers' customers (i.e. indirect purchasers) to also recover would subject defendants to multiplied damages just because the product or service continues to pass through the stream of commerce. *Id.* Second, "[p]ermitting the use of pass-on theories . . . essentially would transform treble-damages actions into massive efforts to apportion the recovery among all potential plaintiffs that could have absorbed part of the overcharge from direct purchasers to middlemen to ultimate consumers." *Id.* at 737.   This would create "a strong possibility that indirect purchasers remote from the defendant would be parties to virtually every treble-damages action . . . [and] would impose on the effective enforcement of the antitrust laws." *Id.* at 741.

Defendant argues that "Plaintiff's federal and Connecticut antitrust claims are barred under the *Illinois Brick* doctrine because Plaintiff is neither a direct purchaser of BMS's services nor the 'proper party' to assert antitrust claims against BMS or Stone Point." (Def.'s Mem. at 10-11.) Although Defendant concedes that California does not adopt the *Illinois Brick* rule for the purposes of its state antitrust law, it argues that Connecticut does, thereby foreclosing Plaintiff's federal and Connecticut antitrust claims. (*Id.* at 10-13.) Defendant argues that only the banks who purchase services from BMS or the trustee who uses the services under license from BMS can be the "direct purchaser." (*Id.* at 12.) Plaintiff, it maintains, is "an assignee of claims from an individual debtor after the estate's assets revested to him" and is, therefore "either a quaternary, or, at best, tertiary purchaser." (*Id.*)

Regarding its Connecticut claim, Plaintiff points to Connecticut's *Illinois Brick* repealer statute, Conn. Gen. Stat. Ann.  § 35-46a,[1] passed in 2018 and argues without authority that it applies retroactively to this claim, (Pl.'s Mem. Opp. Mot. to Dismiss [Doc. # 36] at 16). Plaintiff instead argues that retroactive application would not be unconstitutional. (*Id.*)

Regarding its federal claim, Plaintiff's brief requested that this Court await a decision on Spinner's case against BMS then pending before the Third Circuit, writing that "Spinner's appeal from the District of New Jersey ruling should resolve whether Spinner has a federal claim under antitrust law." (Pl.'s Mem. at 19.) Since the parties' briefing, the Third Circuit has dismissed *Spinner v. Bankruptcy Management Solutions*. 796 F. App'x 132 (3d Cir. 2020). However, the Court of Appeals reached its conclusion on grounds of release rather than any application of the *Illinois Brick* rule on which the district court's dismissal was based. *See id.* Beyond the now-moot request that this Court refrain from making a decision until the Third Circuit case was decided, Plaintiff offered no rebuttal to Defendant's argument that *Illinois Brick* bars Plaintiff's federal antitrust claim.

Two very similar actions against BMS have been litigated in the Northern District of Illinois and the District of New Jersey, both of which the federal district courts dismissed on *Illinois Brick* grounds. *See Spinner v. Bankruptcy Management Solutions*, 604 B.R. 660 (D.N.J. 2019), aff'd on other grounds, 796 F. App'x 132 (3d Cir. 2020); *McGarry & McGarry, LLP v. Bankr. Mgmt. Sols., Inc.*, 2017 WL 2619143 (N.D. Ill. June 16, 2017). Although neither of these district court decisions has binding or preclusive effect, both are instructive.[2]

---

[1] The U.S. Supreme Court held in *California v. ARC America Corp.* that *Illinois Brick* repealer statutes are not preempted by the Sherman Act and that federal law was intended to act merely as a supplement to state antitrust law. 490 U.S. 93, 101 (1989).

[2] The Court declines to give *Spinner v. BMS* any preclusive effect. Since the Third Circuit affirmed the district court's result on grounds other than *Illinois Brick*, the district court's reasoning cannot be said to be "necessary to support a valid and final judgment on the merits." *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 162 F.3d 724, 731 (2d Cir. 1998); *see also Indus. Risk Insurers v. Port. Auth. of New York & New Jersey*, 296 F. App'x 169, 171

In *McGarry*, the plaintiff law firm was an unsecured creditor of a bankruptcy estate. 2017 WL 261943, at *2 (N.D. Ill. June 16, 2017). The plaintiff brought its claim against BMS alleging that it would have received a larger distribution from the estate but for BMS's overcharge. *Id.* The plaintiff argued that although the estate was the direct purchaser, that the plaintiff was still permitted to bring its claim under *Illinois Brick* because any injury to the estate was entirely "passed on" to its creditors. *Id.* at *3. The district court rejected this position, finding that estates are directly injured by overcharging and therefore "own[] any antitrust claim and [are] entitled to one hundred percent of any overcharge." *Id.* The district court concluded that if the plaintiff and the estate were permitted to bring antitrust claims, then BMS would be subject to multiple liability – precisely the outcome the *Illinois Brick* rule was fashioned to prevent. *See id.*

In *Spinner v. BMS*, Plaintiff brought suit against BMS based on the same allegations set forth in this case. The only difference between that lawsuit and the instant suit is that there Plaintiff brought the claim against BMS as a co-conspirator rather than Defendant Stone Point Capital, which Plaintiff alleges here was a co-conspirator. The district court in *Spinner v. BMS* concluded that "the estate is the 'direct purchaser,' and the trustee, as the representative of the estate, is the proper party to bring this antitrust claim." 604 B.R. at 667 (citing 11 U.S.C. § 323). Plaintiff Spinner, the district court found, "occup[ied] a position downstream of the estate" by receiving an assignment from the individual debtor "after the bankruptcy proceeding concluded and the remaining assets of the estate re-vested." *Id.* The district court accordingly dismissed the plaintiff's suit, finding that the plaintiff was an indirect purchaser and therefore lacked standing to bring its claim. *Id.* The Third Circuit affirmed the result, but reached its decision by finding that the plaintiff had released its

---

based on multiple grounds and the appellate court affirms on one ground but not the other, there is no collateral estoppel as to the unreviewed ground." (internal quotation omitted)).

claims against BMS by settling the bankruptcy proceedings. *Spinner v. Bankruptcy Management Solutions*, 796 F. App'x at 135.

Here, Plaintiff is again the individual debtor's assignee. Plaintiff did not directly purchase BMS's services for a fee. Any injury caused by the price-fixing conspiracy would have first harmed the estate and thereby reduced the funds available to creditors. Only after creditors were paid could the debtor have received any residue, thus making any injury to the debtor tertiary. Since the debtor could not be the direct purchasers of BMS's services, neither could its assignee. Accordingly, as an indirect purchaser, Plaintiff lacks standing to pursue its federal antitrust claim. Allowing Plaintiff to pursue this claim would risk subjecting Defendant to multiple liability, the exact risk *Illinois Brick* intends to avert.

Although no court has specifically addressed whether Connecticut's *Illinois Brick* repealer statute applies retroactively, other courts in this district have concluded that virtually identical legislation in Rhode Island does not apply retroactively, citing the "almost universal rule that statutes are addressed to the future, not to the past" and the absence of any evidence that the Rhode Island legislature intended for retroactive application. *In re Aggrenox Antitrust Litigation*, 94 F. Supp. 3d 224, 252-253 (D. Conn. 2015) (quoting *Winfree v. N. Pac. Ry.*, 227 U.S. 296, 301 (1913)). Here, Plaintiff offers no evidence that Connecticut's legislature intended its *Illinois Brick* repealer statute to apply retroactively. Plaintiff's statement that retroactive application is sometimes permissible and, in this case, not unconstitutional, is insufficient to overcome the strong presumption that legislation only applies prospectively. *Illinois Brick* therefore forecloses Plaintiff's Connecticut antitrust claim in addition to its federal claim.

###### 2.    Noerr-Pennington *Doctrine and the California Claim*

The *Noerr-Pennington* doctrine establishes that joint efforts to petition government officials do not violate antitrust law, even if they are expressly intended to eliminate competition. *United Mineworkers of America v. Pennington*, 381 U.S. 657, 670 (1965) (citing

*Eastern R.R. Presidents Conf. v. Noerr Motor Freight Inc.*, 365 U.S. 127 (1961)). *Noerr-Pennington* protects not only the act of petitioning, but also concerted efforts incident to the actual petitioning that amount to preliminary steps. *See Singh v. NYCTL 2009-A Trust*, 683 F. App'x 76, 77 (2d. Cir. 2017) (citing *Primetime 24 Joint Venture v. Nat'l Broad., Co.*, 219 F.3d 92, 99-100 (2d Cir. 2000)). Although *Noerr-Pennington* rests on a statutory interpretation of the Sherman Act, California courts import federal Sherman Act case law in interpreting the state's antitrust law since California's Cartwright Act is "patterned after the Sherman Act and both statutes have their roots in the common law." *Blank v. Kirwan*, 39 P.2d 58, 63 (Cal. 1985) (quoting *Marin County Bd. Of Realtors, Inc. v. Palsson*, 549 P.2d 833, 835 (Cal. 1976)).

The doctrine has its roots in the First Amendment as it protects a party's right to petition all branches of the government. *Miracle Mile Assocs. v. City of Rochester*, 617 F.2d 18, 20 (2d Cir. 1980). For this reason, purely private petitioning activity that takes place outside of the "open political arena" is not protected. *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 504, 507 (1988) (holding that efforts to influence a private standard-setting organization in order to exclude a competitor was not protected by *Noerr-Pennington*). In addition, "sham" petitioning efforts where "the party petitioning the government is not at all serious about the object of that petition, but engages in the petitioning activity merely to inconvenience its competitor" are not granted immunity. *Video Intern. Production, Inc. v. Warner-Amex Cable Communications, Inc.*, 858 F.2d 1075, 1082 (5th Cir. 1988).

Defendant argues that all of Plaintiff's antitrust claims must be dismissed because any petitioning activity done by BMS, Stone Point, or any of the other alleged co-conspirators is privileged under the *Noerr-Pennington* doctrine. (Def.'s Mem. at 24-25.) Since the petitioning was essential to Plaintiff's antitrust claims, Defendant argues that none of Plaintiff's claims can survive if the petitioning allegations are disregarded. (*Id.* at 24.)

Plaintiff responds that Defendant seriously mischaracterizes its allegations regarding the lobbying of the Executive Office of the U.S. Trustee ("EOUST"). (Pl.'s Mem. at 29-30.)

10

Rather, Plaintiff argues that the alleged petitioning serves merely as evidence of a pre-existing conspiracy and that the Complaint makes clear that Plaintiff's injuries resulted from that pre-existing conspiracy, not from any government action. (*Id.* ("The communications of BMS and its conspirators to the EOUST do not form the horizontal conspiracy.")) Plaintiff further maintains that the petitioning of the EOUST was not even essential to execute the conspiracy.  (*Id.* at 32.) Indeed, Plaintiff asserts that *Noerr-Pennington* cannot apply here because Defendant's lobbying efforts were unsuccessful since the U.S. Trustee never approved the proposed pricing system. (*Id.*) Therefore, Plaintiff argues, the lobbying could not have caused any injury. Finally, Plaintiff reasons that applying *Noerr-Pennington* here would lead to an absurd result whereby any anticompetitive agreement could be immunized simply by "subsequently requesting legislative approval." (*Id.* at 31-32 (citing *Allied Tube*, 486 U.S. at 503.)

In fact, what the Complaint actually alleges is that "BMS, Epiq and TrusteSolutions requested that the U.S. Trustee suspend that rule, and allow Trustees to pay bank service fees from Estate accounts"; that although the EOUST did not approve the proposed fee structure, it did "suspend its rule prohibiting Trustees from paying bank service fees from Estate accounts"; and that after April 29, 2011, the day EOUST suspended its rule, "BMS, Epiq, and, upon information and belief, TrusteSolutions acted on their conspiracy." (Compl. ¶¶ 37, 42, 44.) The face of the Complaint indicates that Plaintiff would not have experienced the harm alleged but for the U.S. Trustee suspending its rule, an outcome for which Defendant specifically lobbied.

Plaintiff argues that Defendant "could have executed [its] conspiracy in spite of the rule, and without petitioning the EOUST, by invoicing the Estates, which could then seek approval from the bankruptcy court under 11 U.S.C. § 330 to pay the invoice from the Estates" and therefore that petitioning the EOUST was "not even essential to execute the conspiracy." (Pl.'s Mem. at 23.) Plaintiff's allegation that EOUST intervention was not

necessary to effectuate the conspiracy is inaccurate. The U.S. Trustee himself has stated that the EOUST chose to suspend the rule prohibiting trustees from paying bank service fees from estate accounts "to permit authorized depositories . . . to charge a service fee for integrated case management software and banking services" and that this change was "necessary [to allow] for the payment of integrated case management software and banking services." United States Trustee's Statement in Support of Chapter 7 Trustee's Application to Incur Administrative Expense Claims, ¶¶ 19-20, *In re Midwest Hyperbaric Institute, P.C.*, No. 11-19386 (N.D. Ill. Bankr. Ct.).

Moreover, Section 330 of the Bankruptcy Code does not appear to permit BMS to invoice a bankruptcy estate and seek approval for its fees as Plaintiff contends. The Bankruptcy Code permits a "professional person" to seek reasonable compensation for services provided to a bankruptcy estate. BMS does not constitute a "professional person" within the meaning of the statute. *See In re First Merchants Acceptance Corp.*, No. 97-1500 JJF, 1997 WL 873551, at *3 (D. Del. Dec. 15, 1997). In determining whether an entity amounts to a "professional person" bankruptcy courts consider the following factors:

> (1) whether the employee controls, manages, administers, invests, purchases or sells assets that are significant to the debtor's reorganization, (2) whether the employee is involved in negotiating the terms of a Plan of Reorganization, (3) whether the employment is directly related to the type of work carried out by the debtor or to the routine maintenance of the debtor's business operations; (4) whether the employee is given discretion or autonomy to exercise his or her own professional judgment in some part of the administration of the debtor's estate, i.e. the qualitative approach, (5) the extent of the employee's involvement in the administration of the debtor's estate, i.e. the quantitative approach; and (6) whether the employee's services involve some degree of special knowledge or skill, such that the employee can be considered a "professional" within the ordinary meaning of the term.

*Id.* These factors clearly contemplate a professional person to be an "employee," which BMS plainly is not. Nowhere in its Complaint does Plaintiff allege that BMS's bankruptcy support services involve administering the bankruptcy estate or in any way exercising discretion, autonomy, or personal judgment such that it functioned like an employee. In neither oral

argument nor its Supplemental Reply Brief does Plaintiff dispute Defendant's assertion that BMS is not a professional within the meaning of the Bankruptcy Code.

Thus, Plaintiff's argument that petitioning the EOUST was not necessary to effectuate the conspiracy is erroneous as it would have been impossible to execute the conspiracy without the EOUST's intervention. As a result, Plaintiff's alleged injuries necessarily must stem from the alleged co-conspirators' efforts to lobby the EOUST. Since any lobbying efforts are protected by *Noerr-Pennington*, the Court finds that Plaintiff's California claim must be dismissed.

## A. Conclusion

Defendant's Motion to Dismiss [Doc. # 34] is GRANTED. The Clerk is directed to enter judgment in favor of Defendant and close this case.

IT IS SO ORDERED.

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 30th day of September 2020.